**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Steven Dale Beckman, | ) | No. CV10-08072-PCT-NVW |
| Plaintiff, | ) ) | **ORDER** |
| vs. | ) ) | |
| Michael J. Astrue, Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) ) ) | |

Plaintiff Steven Dale Beckman filed for disability insurance benefits in June 2006. At the time, he lived in Big Bear Lake, California, and all of the proceedings related to his disability benefits application took place in California. In June 2008, an ALJ decided that Beckman is not disabled. The Social Security Appeals Council denied Beckman's request for review. At some point, Beckman moved to Arizona, and he now asks this Court to review the denial of Social Security benefits under 42 U.S.C. § 405(g). The Court will reverse the ALJ's decision and remand for calculation and award of benefits.

**I.   Standard of Review**

The Court must uphold the Commissioner's final decision if it is supported by substantial evidence and not based on legal error. *See* 42 U.S.C. § 405(g); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). The substantial evidence standard requires the evidence, as a whole, to be "more than a mere scintilla but not necessarily a preponderance" and otherwise sufficient such that "a reasonable mind might accept [the evidence] as adequate

to support a conclusion." *Tomassetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal quotation marks omitted). Further, if the "evidence is susceptible to more than one rational interpretation" and the ALJ's decision is supported by one such rational interpretation, the Court will affirm the ALJ. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

The Court will review only the issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 235 F.3d 503, 517 n.13 (9th Cir. 2001). The Court will not reverse for harmless error, which exists "when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tomassetti*, 533 F.3d at 1038 (internal quotation marks omitted). However, the Court will "review the ALJ's decision based [only] on the reasoning and factual findings offered by the ALJ." *Bray v. Comm'r of SSA*, 554 F.3d 1219, 1225 (9th Cir. 2009). The Court will not "attempt to intuit what the adjudicator may have been thinking." *Id*.

## II. Facts

### A. Plaintiff Stephen Dale Beckman

Beckman is 55 years old. Since he graduated from high school in 1973, he has worked a variety of jobs, including truck driver, self-storage clerk, and driver/dock hand for a freight company. In 2002, Beckman received a closed period of disability benefits while he successfully fought an unspecified cancer. Beckman then went to work (or back to work) at a lumber yard. Beckman quit his lumber yard job in mid-November 2005, claiming that he no longer had the physical ability to perform the work. Beckman marks this as the time he became permanently disabled, resulting from a life of strenuous work. Beckman specifically claims that various symptoms of pain, tingling, and numbness in his neck, back, arms, and legs prevent him from obtaining substantial gainful employment.

### B. Medical Evidence

#### 1. The CT Scan

In 2003, Beckman obtained a CT scan of his neck area. This scan revealed post-traumatic arthritic deformities at the skull base and in the cervical spine, as well as a deformity in the cervical spine that may have resulted from a fracture. The scan also

revealed mild stenosis.

### 2. Dr. Siambanes

Beckman began seeking treatment from an orthopedic specialist, Dr. David Siambanes, in 2004. In November 2004, Dr. Siambanes diagnosed multiple-level cervical degenerative changes with severe facet arthropathy, as well as lumbosacral strain superimposed on multiple-level degenerative changes.

In March 2006, Dr. Siambanes completed a report for the California state disability agency. Dr. Siambanes repeated his previous diagnosis and opined that Beckman could not perform any of his "regular or customary work," nor would he likely be able to return to work until early 2007. (Tr. 144.)

In October 2006, Beckman saw Dr. Siambanes again. In his report for this visit, Dr. Siambanes remarked that Beckman "has chronic neck and low back pain with changes noted on radiographs and CT scans consistent with a degenerative condition impairing his ability to bend, twist, lift, carry, or stand or sit for any period of time, which is clearly altering his ability to perform gainful employment." (Tr. 163.) As will become significant later, Dr. Siambanes signed this report with an "/s/" e-signature.

Dr. Siambanes examined Beckman again in March 2007. Dr. Siambanes noted restricted range of motion in the neck, arms, lumbar area, and legs. Dr. Siambanes also noted pain and tenderness in both the neck and lumbar regions. A few months later, at Dr. Siambanes's urging, Beckman had an MRI scan done on his neck, which revealed some stenosis and disc bulges.

In May 2008, Dr. Siambanes examined Beckman as part of a progress report for the California state disability agency. Dr. Siambanes again noted pain and tenderness arising from Beckman's neck and lumbar regions, along with restricted motion. Dr. Siambanes diagnosed multiple-level spondylosis.

### 3. Dr. Sophon

In September 2006, Dr. Bunsri Sophon examined Beckman at the request of the disability agency. Dr. Sophon tested Beckman's range of motion throughout the neck, back,

lumbar region, arms and legs, and found essentially no limitations and no tenderness. Dr. Sophon concluded, "No orthopedic diagnosis." (Tr. 154.)

### 4. Dr. Yu

In March 2007, Dr. Warren Yu examined Beckman at the request of the state disability agency. Dr. Yu noted restricted range of motion in the neck, back, and lumbar region, along with tenderness, but normal range of motion in the legs and arms. Dr. Yu also recorded "numbness throughout the fingertips of the bilateral hands." (Tr. 168.) Dr. Yu diagnosed neck and back pain with underlying spondylosis, and concluded with a "functional assessment" that

> the patient should be able to walk without an assistive device. The patient should be able to sit for up to six hours in an eight-hour day. Standing and walking should be limited to two hours in an eight-hour day. He should occasionally be allowed to pick up 20 pounds and frequently 10 pounds. The patient should have frequent use of the upper extremities for pushing, pulling, fine finger motor movements and handling. He should be limited to only occasional squatting, stooping, kneeling, crawling, climbing, bending or lifting.

(Tr. 169.)

### 5. Dr. Spellman

In April 2007, Dr. G. G. Spellman reviewed Beckman's file for the state agency. Based on this review, Dr. Spellman concluded that Beckman could occasionally lift 20 pounds and frequently lift 10 pounds; he could stand or walk for six hours and sit for about six hours in an eight-hour day; he could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; but he should never climb ladders, ropes, or scaffolds.

### C. The ALJ Hearing

Beckman had his hearing in front of an ALJ in June 2008. Beckman testified about his last job at a lumber yard where he "pretty much did everything out in the yard," including running loaders and forklifts, pulling orders and delivering them, and so forth. (Tr. 14.) According to Beckman, he stopped working at the lumber yard because

> [m]y hands would go numb. I'd drop material, drop lumber.

> My hands go numb when I'm driving. I constantly have to change hands while I'm steering. My back pain. I, I couldn't pick anything up. I got to the point I could hardly walk. I have pain in my legs, numbness in my arms. I wake up in the night, and my hands'll been numb from my elbows down, tingling. My arms and my hands feel — my fingers feel like somebody's pounding on my fingers with a hammer.

(Tr. 14–15.) Beckman also testified that the pain he experiences makes it

> hard to focus on what you're doing . . . . For me, anyway. You have excruciating pain at times, and going to just numbness and throbbing. It's — it comes and goes. It's hard for me to focus on what I'm doing. It really is. That, combined with the fact that some days, I can hardly get out of bed, it'd be pretty hard for me to follow any kind of schedule with any kind of work.

(Tr. 17.)

As far as current income, Beckman explained that he lives off a 401(k) that he inherited from his father. In terms of finding other work, Beckman had this exchange with the ALJ:

> Q. Well, once you realized that you couldn't do that [lumber yard] work anymore, and you stopped doing it, I mean, this is mid-November of 2005. Did you look for any other kind of work?
> A. Yes. I can't find anything, sir. Big Bear's a small town. There's not a whole lot going on up there.
> Q. What other kind of work did you look for?
> A. Well, I've been a truck driver all my life. Like I say, there's not a whole lot in Big Bear. I can't lift a whole lot. I drop things, so it's not like I could work in a little paint store.
> Q. Did you actually go, and open doors, and ask for work, fill out application forms, or did you just simply —
> A. No, I've —
> Q. — look in the local paper, or what?
> A. I've looked in the local paper. There's, there's just not a lot in Big Bear.

(Tr. 16.) The ALJ did not ask any follow-up questions regarding the jobs that Beckman looked for. However, perhaps prompted by the motorcycle endorsement on Beckman's driver's license, the ALJ asked:

> Q. Still have your motorcycle?
> A. No.
> Q. When did you last ride a motorcycle?
> A. It's been a few years.
> Q. When? How long ago? Few —
> A. A few years.
> Q. Few could mean —
> A. Three years, three years.
> Q. — one year, two years —
> A. Three years.
> Q. I'm sorry?
> A. Three years. I have a motorcycle sitting in the garage, but I don't ride it.

(Tr. 19.)

The ALJ then questioned Beckman about his medical care. Beckman offered that he sees Dr. Siambanes about every six months. However, Beckman's unemployment and history of cancer effectively prevents him from buying health insurance, so his ability to get medical care is limited. Although Dr. Siambanes has provided most of his services for free (apparently as a favor to a friend of Beckman), everything outside of Dr. Siambanes's control, such as prescription drugs or MRIs, is an out-of-pocket expense to Beckman.

When the ALJ finished questioning Beckman, Beckman's attorney followed up with this exchange about Beckman's symptoms:

> Q. Now, you say you have problems with numbness. Do you have a problem with dropping things?
> A. Constantly.
> Q. Okay.
> A. And numbness. I don't have any strength hardly in my hands left. No grip strength. I drop things all the time.
> Q. Okay. Do you have to lay down at all during the day and rest?
> A. Yes.
> Q. About how often?
> A. Well, some days are better than others, depending. Sometimes, weather systems go through. I'm — a lot more pain. Usually, once or twice a day, I have to lay down and take 15 minutes to 20 minutes just to lay down and, and get off my legs and my back.

(Tr. 22.)

1       The ALJ then examined the vocational expert, Corinne Porter, posing the following hypothetical:

> I'd like you to assume an individual of the same age, education, and work experience as the claimant. Further, assume a residual functional capacity for a full range of light work, except as I say otherwise, as follows: able to frequently use hand levers and controls; all of the posturals are occasional, except no climbing of ramps — or, no climbing ladders, scaffolds, or ropes; and manipulation, frequently able to handle and finger. Based on these circumstances, could the claimant do any of the — could this person do any of the claimant's past work?

(Tr. 29–30.) To this, Porter testified that such a person could be a storage clerk. The ALJ then modified the hypothetical to assume that standing and walking would be restricted to two hours out of eight. Porter testified that such a restriction eliminated all of Beckman's past work, but other jobs were available, including sewing machine operator, electronics worker, and circuit board repair person. All three jobs, said Porter, exist in substantial numbers in both the national and regional economy.

      Beckman's attorney then asked Porter, "If we assume that he's going to be off task about 20 percent of the time, what effect would that have on the occupational base there?" Porter replied, "There would not be any work. The individual wouldn't be working at a competitive rate for full-time employment." (Tr. 31–32.)

### D.     The ALJ's Decision

      The ALJ issued his decision on July 3, 2008. The ALJ concluded that Beckman "has the following severe impairments: lumbar spine disorder, cervical spine disorder, and numbness in his arms, legs, and hands" (Tr. 40 (citation omitted)), but that such impairments did not automatically qualify Beckman for disability benefits. The ALJ then went on to evaluate Beckman's residual functional capacity:

> I find that the claimant has the residual functional capacity to perform a limited range of light exertion. The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently. He can push and pull 20 pounds occasionally and 10 pounds frequently. He can stand and walk for 2 hours out of an 8-hour workday, and he can sit for 6 hours out of an 8-hour workday.

- 7 -

> He cannot climb ladders, ropes, or scaffolds. He can occasionally climb ramps and stairs. He can occasionally balance, bend, stoop, crouch, and kneel. He can frequently reach overhead, above the shoulders, and in all directions. He can perform frequent hand manipulation.

(Tr. 40–41.) The ALJ stated that he adopted this residual functional capacity assessment from the opinion of Dr. Yu because Dr. Yu's "assessment [was] consistent with the evidence as a whole." (Tr. 43.) The ALJ then adopted the vocational expert's opinion, concluding that Beckman could do none of his past work but he could still be a sewing machine operator, electronics worker, or circuit board repair person. Therefore, the ALJ concluded that Beckman was not disabled.

Regarding Beckman's own testimony about his symptoms (*e.g.*, the intensity of his pain, his need for rest during the day, his numbness that causes him to drop objects), the ALJ found it "less than fully credible" because "[t]he claimant's testimony was vague and evasive at times." (Tr. 43.) The ALJ gave two examples of such supposed vagueness or evasiveness. First,

> [t]he claimant, who complained about having a back problem, was asked if he still owned a motorcycle (riding a motorcycle is known to be hard to do with a back problem). The claimant first said no, but he later said he still kept his motorcycle in his garage. It is difficult to believe the claimant would keep a motorcycle without riding it, especially since he has indicated he has limited resources.

(Tr. 43.) Second, "[w]hen asked if he looked for other work after his last job in 2005, the claimant said yes, but he did not provide any details regarding the type of work he has sought." (Tr. 43.) The ALJ also seemed to feel justified in discrediting Beckman's testimony because Beckman "has had very little medical treatment" and "[t]here is no evidence the claimant has sought emergency room treatment for acute exacerbation of symptoms." (Tr. 43–44.)

The ALJ's decision contains little discussion of Beckman's primary treating physician, Dr. Siambanes, except that the ALJ discounts Dr. Siambanes's March 2006

- 8 -

disability finding for the California state disability agency because that state agency relies on different criteria than the Social Security Administration. "Moreover," the ALJ continued, "the finding of disability is inconsistent with the medical evidence summarized herein." (Tr. 44.) The ALJ also discounts Dr. Siambanes's October 2006 opinion — the e-signed opinion — because (i) it was not properly signed; (ii) it "implies that the claimant cannot work, but it is vague and does not clearly specify what the claimant can do despite his impairments"; and (iii) "the objective findings in the remainder of the record do not support a finding of disability." (Tr. 44.)

### III. Analysis

Beckman's main challenge to the ALJ's opinion is its residual functional capacity conclusion. The ALJ gave all weight to Dr. Yu, and no weight either to Dr. Siambanes or Beckman's own testimony about his symptoms. The Court will first discuss the ALJ's treatment of Dr. Siambanes and Dr. Yu. The Court will then address the ALJ's treatment of Beckman's symptom testimony.

#### A. Medical Opinion Testimony

Beckman argues that the ALJ, in reaching his residual functional capacity assessment, improperly discounted Beckman's treating physician's opinions. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). In this case, the ALJ gave all the weight to Dr. Yu, a non-treating physician, and no weight to Dr. Siambanes, the treating physician. The ALJ may do so only if he provided "specific and legitimate reasons supported by substantial evidence in the record." *Id*. (internal quotation marks omitted).

Before addressing whether the ALJ met this standard, it bears noting that most of the medical professionals' opinions in the record are substantially consistent. With the exception of Dr. Sophon (who examined Beckman once at the state's request), all doctors agreed that Beckman has neck, back, arm, and leg problems that limit his abilities somewhat. The doctors disagree only in how much those problems limit him.

Dr. Siambanes stated in his March 2006 disability finding for the state of California that Beckman could not return to his previous employment. The ALJ discounted this opinion because it was intended for the state disability agency, which supposedly operates under different standards. However, the only difference that the ALJ or the Commissioner has discussed is that the Social Security Administration requires an opinion both on whether the claimant can perform his past work and whether he can perform any other work. Dr. Siambanes's March 2006 opinion is relevant to the first question. Therefore, the ALJ could not discredit it completely for failing to offer an opinion on the second question.

As to that first question, the ALJ still found it unpersuasive because "the finding of disability is inconsistent with the medical evidence summarized herein." This reasoning is difficult to understand. The ALJ himself concluded that Beckman cannot return to any of his previous work. The ALJ cannot declare Beckman unable to return to his former employment and yet discount a doctor's opinion for reaching the same conclusion. Accordingly, the ALJ had no legitimate reasons for discounting Dr. Siambanes's March 2006 opinion.

Nonetheless, the ALJ is correct that Dr. Siambanes's March 2006 opinion about Beckman's ability to perform his past work does not resolve whether Beckman can perform any other work. Dr. Siambanes's October 2006 report approaches this question, stating that Beckman "has chronic neck and low back pain with changes noted on radiographs and CT scans consistent with a degenerative condition impairing his ability to bend, twist, lift, carry, or stand or sit for any period of time, which is clearly altering his ability to perform gainful employment."

The ALJ chose to give no weight to this opinion for three reasons. First, it was not signed by hand. The Commissioner, however, concedes that this reason is not legitimate. (Doc. 23 at 7–8.) Second, it "implies that the claimant cannot work, but it is vague and does not clearly specify what the claimant can do despite his impairments." At least in part, this is a specific and legitimate reason to discredit Dr. Siambanes's opinion. "The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief,

conclusory, and inadequately supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). Dr. Siambanes's opinion that Beckman's conditions "alter[] his ability to perform gainful employment" is too vague to provide much guidance to the ALJ. Accordingly, the ALJ did not need give weight to that assertion.

Even if Dr. Siambanes's statement about Beckman's ability to work is not entitled to weight, it does not discredit his opinion that Beckman's conditions "impair[] his ability to bend, twist, lift, carry, or stand or sit for any period of time." As to that conclusion, the ALJ's third reason for rejecting Dr. Siambanes's opinion apparently applies: "the objective findings in the remainder of the record do not support a finding of disability." Presumably "objective findings" refers to "objective medical evidence," defined in the Social Security regulations to mean "medical signs and laboratory findings." 20 C.F.R. § 404.1529(a). "Signs" and "laboratory findings" are in turn defined as follows:

> (b) Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from [a claimant's subjective] statements (symptoms). . . . Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.
>
> (c) Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests.

20 C.F.R. § 404.1528(b)–(c).

In claiming that "the objective findings in the remainder of the record do not support a finding of disability," the ALJ is apparently saying that signs and laboratory findings do not support Dr. Siambanes's opinion about Beckman's "ability to bend, twist, lift, carry, or stand or sit for any period of time." But nearly every doctor who examined Beckman noted

his restricted ability to bend and twist. Therefore, in that respect, Dr. Siambanes and the "objective findings in the remainder of the record" agree. As for the ability to lift and carry, it appears that no one actually tested these abilities. Some doctors tested grip strength (which was generally normal), but grip strength does not necessarily translate into lifting and carrying. Finally, concerning the ability to "stand or sit for any period of time," no party has pointed to signs or laboratory findings about this. Some doctors noted that Beckman could sit comfortably through a physical exam, but without more (*e.g.*, information on the length of the exam, how long Beckman sat continuously, etc.) that does not establish his ability to sit, much less stand, "for any period of time."

In short, there are no "objective findings in the remainder of the record" that undermine Dr. Siambanes's statements about Beckman's limited "ability to bend, twist, lift, carry, or stand or sit for any period of time." However, simply because Dr. Siambanes opined consistently with the record as a whole does not establish that Beckman's residual functional capacity precluded all work. On this question, the only direct evidence available to the ALJ came through Dr. Yu's and Dr. Spellman's assessments, and the ALJ chose to rely on Dr. Yu, who concluded that Beckman

> should be able to sit for up to six hours in an eight-hour day. Standing and walking should be limited to two hours in an eight-hour day. He should occasionally be allowed to pick up 20 pounds and frequently 10 pounds. The patient should have frequent use of the upper extremities for pushing, pulling, fine finger motor movements and handling. He should be limited to only occasional squatting, stooping, kneeling, crawling, climbing, bending or lifting.

This opinion and Dr. Siambanes's opinion appear to conflict with respect to: (i) the duration Beckman can sit; (ii) how much Beckman can push, pull, and handle; and perhaps (iii) how much weight Beckman can lift.

Dr. Yu's modal phrasing — "should be able," "should . . . be allowed," etc. — is troubling because Dr. Yu does not explain how his physical examination of Beckman justified these conclusions. Nonetheless, Dr. Siambanes's opinions are likewise lacking in

detail. But given the preference for treating physician's opinions over those from other medical sources, *Lester*, 81 F.3d at 830, and in light of all the evidence (especially Beckman's own testimony, discussed below), it was error for the ALJ not to explain clearly why he favored Dr. Yu's opinion over that of Dr. Siambanes.

### B. Beckman's Symptom Testimony

At the ALJ hearing, Beckman testified about two symptoms that limit his ability to function: pain, which distracts him and sometimes requires him to rest during the day; and numbness, which (among other things) causes him to drop things frequently. Each of these symptoms has an objective and a subjective component. For example, we can observe someone wincing and objectively conclude that the person is in pain. But the Commissioner's interpretive rulings recognize that the intensity of symptoms is often purely subjective: "individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments." Social Security Ruling (SSR) 96-7p, 1996 WL 374186, at *3.

Therefore, "a claimant who alleges disability based on subjective symptoms . . . need not produce objective medical evidence of the [symptom] itself, or the severity thereof." *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996). Instead, he must (a) "produce objective medical evidence of an impairment or impairments" and (b) "show that the impairment or combination of impairments could reasonably be expected to (not that it did in fact) produce some degree of [the subjective] symptom." *Id*. at 1282. If the claimant satisfies this test, then the Commissioner's rulings obligate the ALJ to evaluate the claimant's credibility in light of

> the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.

SSR 96-7p, 1996 WL 374186, at *2. If the ALJ concludes that the claimant's symptom

testimony is not credible, the ALJ must "make[] specific findings stating clear and convincing reasons for doing so. The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen*, 80 F.3d at 1284 (citation omitted).

Here, objective medical evidence confirmed the existence of Beckman's pain and numbness. A CT scan and an MRI both confirmed degenerative changes that could cause pain and numbness. Further, every doctor that met with Beckman personally, except Dr. Sophon, noted restricted range of motion, pain, and so forth, when Beckman moved in certain ways. Dr. Yu specifically noted numbness in Beckman's fingertips on both hands. Accordingly, Beckman satisfied his burden to produce objective medical evidence of conditions that could cause pain and numbness. The ALJ nonetheless found Beckman's testimony about his symptoms "less than fully credible." The ALJ therefore had a duty to state clear and convincing reasons for rejecting Beckman's testimony.

The ALJ stated "clear" reasons for rejecting Beckman's testimony, but none of these reasons are "convincing." First, the ALJ stated that he disbelieved Beckman generally because, when asked about whether he still owned his motorcycle, Beckman "first said no, but he later said he still kept his motorcycle in his garage. It is difficult to believe the claimant would keep a motorcycle without riding it, especially since he has indicated he has limited resources." However, Beckman's change from "no" to "I still have one in the garage" was something that Beckman himself quickly volunteered. It did not come out through some sort of cross-examination. Thus, the apparent discrepancy has no obvious significance. Further, whether Beckman needs to or can sell his motorcycle is unwarranted speculation, and does not impeach his truthfulness generally. Accordingly, neither does it impeach his symptom testimony.

The ALJ next claimed that Beckman was vague and evasive because "[w]hen asked if he looked for other work after his last job in 2005, the claimant said yes, but he did not provide any details regarding the type of work he has sought." But it was the ALJ who asked him if he looked for other work, and it was the ALJ who pursued another line of questioning

- 14 -

after Beckman supposedly gave an answer lacking in detail. If the ALJ was concerned about that lack of detail, the ALJ should have asked for detail. As it stands, the lack of detail alone is not a convincing reason to distrust Beckman's general truthfulness, and therefore not a convincing reason to distrust his symptom testimony.

Finally, the ALJ remarked that Beckman "has had very little medical treatment" and "[t]here is no evidence the claimant has sought emergency room treatment for acute exacerbation of symptoms." But Beckman explained that he cannot get health insurance because he is unemployed and a cancer survivor. Apparently the ALJ disbelieved this explanation, although the ALJ does not explain why. Without such an explanation, Beckman's supposed paucity of medical care says nothing about his credibility.

The ALJ did not articulate convincing reasons for disbelieving Beckman's testimony about his symptoms, nor for placing no weight on Dr. Siambanes's opinions. "Because the ALJ failed to provide legally sufficient reasons for rejecting [Beckman]'s testimony and [his] treating physician['s] opinions, [this Court] credit[s] the evidence as true." *Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004). Remand for award of benefits is appropriate if "there are no outstanding issues that must be resolved before a determination of disability can be made." *Id.* Here, no outstanding issues must be resolved. Regarding the effects of Beckman's numbness and consequent tendency to drop things, it is clear that he could perform none of the jobs supposedly available to him (sewing machine operator, electronics worker, and circuit board repair person). And concerning Beckman's pain, Beckman's attorney asked the vocational expert whether any work would be available to Beckman if he was "off task about 20 percent of the time." The vocational expert replied, "There would not be any work. The individual wouldn't be working at a competitive rate for full-time employment." Therefore, Beckman is disabled for purposes of the Social Security Act, and the matter will be remanded for calculation and award of benefits.

IT IS THEREFORE ORDERED that the final decision of the Commissioner of Social Security is REVERSED and this case is REMANDED for calculation and award of benefits. The Clerk shall enter judgment accordingly and shall terminate this case.

DATED this 23rd day of August, 2011.

Neil V. Wake
United States District Judge